IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MARGARET A. MANCHOOK, | Case No. 1:18-cv-1593 |
| Plaintiff, | JUDGE JAMES S. GWIN |
| v. | MAGISTRATE JUDGE THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY | |
| | **REPORT & RECOMMENDATION** |
| Defendant. | |

**I.  Introduction**

Plaintiff, Margaret A. Manchook, seeks judicial review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  Because the ALJ failed to adequately explain his consideration of a treating physician's opinion, I recommend that the final decision of the Commissioner be VACATED, and the matter be REMANDED for further proceedings consistent with this report.

**II.  Procedural History**

Margaret A. Manchook applied for DIB and SSI on April 7, 2015 and April 9, 2015.  (Tr. 745-749)[1].  She alleged a disability onset date of February 15, 2015.  (Tr. 745).  Her application was denied initially on September 3, 2015 (Tr. 650-656) and on reconsideration on December 21, 2015.  (Tr. 660-671).  Manchook requested a hearing (Tr. 672) and Administrative Law

---

[1] The transcript is filed as ECF Doc. 10.

Judge ("ALJ") Joseph Vallowe heard the case on July 19, 2017. (Tr. 523-573). On December 28, 2017, the ALJ issued a decision finding that Manchook was not disabled. (Tr. 485-511). On May 16, 2018, the Appeals Council denied Manchook's request for further review, rendering the ALJ's conclusion the final decision of the Commissioner. (Tr. 1-4). On July 12, 2018, Manchook filed this action to challenge the Commissioner's denial of her claim. ECF Doc. 1.

**III.    Evidence**

    **A.    Relevant Medical Evidence[2]**

Manchook was born on January 7, 1981 and was 36 years old on the day of her hearing. (Tr. 745). She had past relevant work as a state tested nurse assistant ("STNA"), a parts assembler and a fast food worker. (Tr. 538, 565).

Manchook began suffering from depression and mental health issues when she was fifteen years old. (Tr. 2163). Starting in October 2012, she was attending medication management sessions with nurse practitioner, Bernard Nosanchuk. Manchook complained of depression and anxiety. However, Mr. Nosanchuk often observed a full-range of affect; that Manchook was friendly, talkative and smiled appropriately; and that she did not appear to be in any emotional distress. (Tr. 2211, 2218, 2225, 2233). Mr. Nosanchuk consistently assigned a Global Assessment of Functioning "GAF" score of 60, indicating moderate symptoms of functioning. (Tr. 2165-2255). Manchook was able to work until February 2015.

Manchook began attending an intensive outpatient partial hospitalization program ("PHP") in March 2015. She attended group therapy five days per week from 9:00 a.m. to 12:00 p.m. (Tr. 2275). Progress notes show that she reported feeling anxious, hopeless, and

---

[2] Manchook's challenge to the Commissioner's decision is narrowly tailored to the ALJ's consideration of her treating physician's opinion that she would miss more than four days of work per month. Nonetheless, I have included an abridged summary of the medical evidence from the 3748-page transcript.

2

overwhelmed at times, but she was generally alert, taking her medications, and participating in the group. (Tr. 2275, 2280, 2282, 2284, 2286, 2287, 2289, 2290, 2292, 2294, 2296, 2304, 2360, 2370). She continued through August 2015. She had two panic attacks during group therapy. (Tr. 2406, 2410).

On March 10, 2015, Manchook told her case worker, Leslie Green, that she had increased anxiety since her surgery and quitting her job. She was frustrated with her lack of motivation and had been sleeping a lot more lately. (Tr. 1367-1368). On March 23, 2015, Ms. Green noted that Manchook was coping well with her anxiety and attributed her reduction of symptoms to accepting things the way they are presented. (Tr. 1366). On April 13, 2015, Ms. Green noted that Manchook had added art therapy to motivate her toward change and resolution. Manchook reported feeling low energy, having crying spells, and isolating from the outside world. She felt increased frustration and helplessness. (Tr. 1362).

Manchook was discharged from services at Ohio Guidestone in June 2015 when she "abruptly declined services after two and a half years of treatment." Ms. Green noted that Manchook had been consistent with her appointments but was very resistant and in denial about resolving issues. She avoided at times and blamed others in addition to feeling inappropriately guilty toward circumstantial stress. Ms. Green opined that Manchook continued to need intensive services in an outpatient setting including partial hospitalization, individual counseling and medication services. (Tr. 1443). Manchook received counseling several times a week from August 2014 to November 2015. (Tr. 2155-2457).

From September 9 to September 24, 2015, Manchook was hospitalized for depression and suicidal ideations. She reported a loss of interest in doing things, low energy levels, poor concentration, and feeling hopeless, helpless, and worthless. (Tr. 1546). She reported suicidal

3

thoughts with no specific plan. She complained of symptoms of anxiety, having difficulty with interactions with other people, being out in public in common areas, and in front of groups of people. (Tr. 1546). Her mental status examination showed that she was conscious, alert in all spheres, and cooperative. Her memory was intact, and her attention and concentration were fair. Her thought process was linear and concrete and her thought content had no specific paranoia. Her insight was fair. She was diagnosed with bipolar disorder, current episode depressed, severe, without psychotic features; and anxiety disorder, not otherwise specified. (Tr. 1547). During her hospitalization, she underwent five electroconvulsive therapy ("ECT") sessions. (Tr. 1545-1603). At discharge, she was sleeping better, eating better, was more social, not suicidal and was taking her medications. (Tr. 1599).

After her hospitalization, Manchook continued to attend intensive outpatient therapy in a PHP at Signature Health four days a week from 9:00 a.m. to 12:00 p.m. (Tr. 265). Her progress notes show that she continued to struggle with anxiety and frustration, but was alert, an active participant, responded well to feedback, denied any problems with her medication and denied suicidal ideation. (Tr. 2420, 2422, 2424, 2426, 2450, 2452, 2455).

On September 25, 2015, Manchook went to the emergency room with tremors that began three days earlier. She reported that her tremors began after ECT. (Tr. 1606). Physical examination was normal and she did not have any tremors while at the hospital. (Tr. 1608). She was instructed to follow up with a neurologist and her psychiatrist. (Tr. 1608). Manchook returned to the emergency room on September 26, 2015 with similar complaints. The physician opined that the tremors were caused by increased serotonin and were secondary to the ECT. Manchook was advised to reduce her dosage of sertraline. (Tr. 1629).

Manchook returned to the emergency room on October 1, 2015.  She complained of somnolence and memory loss following an AA meeting; she may have passed out but was not sure.  Her physical examination was negative for any acute medical cause for her symptoms.  (Tr. 1643).  On November 2, 2015, Manchook told her family physician that her episode of amnesia may have been caused by the electroconvulsive therapy.  (Tr. 1702).

In October 2015, after Mr. Nosanchuk left the practice, Manchook began treating with Dr. Adella Wasserstein.  (Tr. 2163).  Dr. Wasserstein assessed anxiety and episodic mood disorder (mostly depressed with good control of mania.)  At her first visit, Manchook kept nodding off and Dr. Wasserstein sent her to the emergency room.  (Tr. 2164).

In November 2015, Manchook was less sleepy and no longer dozing off.  (Tr. 2272).  Her mental status examination showed that she was alert and oriented, withdrawn, but pleasant; her attention and concentration were within normal limits; her mood and affect were euthymic; her speech was regular; her thought process was goal oriented; and her associations and thought content were within normal limits; her recent and remote memory were grossly intact; her judgment and insight were fair.  (Tr. 2268).  Her mental examination returned similar results on December 1, 2015.  (Tr. 2606).  Manchook reported that group therapy was the only place she fell asleep.  (Tr. 2612).

Manchook received counseling on a weekly basis from January 2016 to May 2017.  (Tr. 2791-3120, 3170-3311, 3487-3510, 3550-3693).  Dr. Wassertein occasionally noted a depressed and anxious mood, but many of her mental status examinations were normal.  Dr. Wasserstein repeatedly assigned a GAF score of 60.  (Tr. 2603-2623, 2747-2789, 3133-3167, 3479-3510).

In January 2016, Manchook was evaluated by neurology for potential seizure.  A prolonged EEG was normal, both awake and asleep.  (Tr. 2646).

5

On February 2, 2016, Dr. Wasserstein's findings were similar except that Manchook's mood was "euthymic to upset." (Tr. 2750). Dr. Wasserstein noted that PHP ended on February 8, 2016, that dialectical behavior therapy ("DBT") was to start on February 10, and that art therapy was to start on February 9. However, Manchook missed therapy because she was ill. (Tr. 2755). Her mood and anxiety were okay with medications despite stressors related to her daughter. She did not feel ready to take possession of her yet because she was too newly on her own. (Tr. 2755).

On February 23, 2016, she told Dr. Joshua Sunshine that she was doing well and had no complaints; she felt less depressed. (Tr. 2633). On March 14, 2016, Manchook's mood and affect returned to euthymic and her mental status examination was unremarkable. (Tr. 2760). She had custody of her daughter again and was unable to go to DBT and group therapy but had been attending appointments. (Tr. 2766).

In April 2016, she had a depressed and anxious mood and affect but otherwise a normal mental examination. (Tr. 2771). Manchook reported anxiety and difficulty feeling motivated over the past two weeks. She was not interested in going anywhere and was sleeping about six hours. (Tr. 2777). On May 9, 2016, Manchook's mood was euthymic to overwhelmed and her affect was euthymic. Her mental status examination was normal. (Tr. 2782).

In June 2016, Manchook reported an increase in depression to her therapist, Kaitlyn Baker. She was staying home and not feeling motivated to complete daily tasks. (Tr. 3081). Later in June, Manchook reported that she was feeling more optimistic; she was modelling positive healthy behavior for herself and her two daughters. (Tr. 3094).

On August 12, 2016, Manchook reported that she was not feeling depressed or hopeless to her primary care physician. (Tr. 3122). When she met with Dr. Wasserstein on August 22,

6

2016, she had a depressed to anxious mood, but euthymic affect. Otherwise, her mental examination was normal. (Tr. 3133-3134). Manchook reported that she had stopped taking all her medications two weeks ago at the instruction of her counselor, Ms. Baker. She had actually been instructed to stop taking supplements that were causing diarrhea and had decided to stop all of her medications. Three days before her appointment, she had started taking all her medications again except Gabapentin. Dr. Wasserstein continued her medications and prescribed a lower dose of Gabapentin. (Tr. 3136).

Manchook's status examination was the same in September 2016. She told Dr. Wasserstein that she continued to feel tired and depressed but was not hopeless or suicidal. (Tr. 3142). In October 2016, Manchook complained of feeling depressed, isolative, having low appetite, intermittent waking and suicidal ideation. She had gone to the emergency room with suicidal ideation but did not require hospitalization. She was attending PHP every day. Dr. Wasserstein did not note any changes to her status examination. (Tr. 3149).

In November 2016, Manchook reported sleeping more during the day because she was only attending group therapy two times a week. She was still having suicidal ideation and had called the crisis hotline the night before. (Tr. 3156). In December 2016, she continued to complain of occasional passive suicidal ideation. She reported depressive symptoms of nighttime sadness and isolation. Her anxiety was improving with increased Gabapentin. (Tr. 3485).

Manchook did not visit her counselor for several weeks. In January 2017, Manchook reported that she had been isolating at home and continued to feel unmotivated. She was spending most of her day at home lying on the couch. (Tr. 3494). Later in January, her

7

complaints were similar. She reported that she was going to Chicago with her aunt to participate in a thorough holistic evaluation. (Tr. 3502).

In March 2017, Manchook's mood was euthymic to anxious because of her social security appeal. Her affect was euthymic to bright. (Tr. 3679). She was having difficulty with sleep onset. (Tr. 3683). Her mental status examination was normal. (Tr. 3677-3685). In April 2017, her mood and affect were euthymic and her mental status examination was normal again. (Tr. 3686-3693).

Manchook continued to visit her counselor through May 2017. She complained of ongoing depression and lack of motivation, but she had many normal mental examinations. (Tr. 3564, 3572, 3580, 3588, 3596, 3604, 3612, 3620, 3628, 3636, 3644).

**B. Opinion Evidence**

    **1. Treating Physician – Dr. Wasserstein**

        **a. November 2016 – Assessment of Ability to Do Work Related Activities (Mental)**

On November 16, 2016, Dr. Wasserstein completed a questionnaire related to Manchook's ability to do work-related activities. (Tr. 3125-3126). She opined that Manchook had marked limitations in her ability to maintain concentration and attention for extended periods; to sustain a routine without special supervision; to respond to customary work pressures; to respond appropriately to changes in the work setting; and to behave in an emotionally stable manner. (Tr. 3125-3126). She noted that Manchook's medications improved her ability to function. She anticipated that Manchook's impairments or treatment would cause her to miss work five times or more per month. (Tr. 3126).

### b. June 2017 - Medical Statement Concerning Depression

Dr. Wasserstein completed another medical statement questionnaire related to Manchook's depression on June 13, 2017. Dr. Wasserstein opined that Manchook had a marked limitation in her ability to concentrate, persist or maintain pace at task and in her ability to adapt or manage herself. Dr Wasserstein also indicated that Manchook's disorder was serious and persistent. (Tr. 3748).

### c. June 2017 – Off-Task/Absenteeism Questionnaire

Dr. Wasserstein also completed a questionnaire related to absenteeism on June 13, 2017. On this form, she opined that Manchook would be off task at least 20% of the time and absent from work about four times a month due to her impairments or treatments. (Tr. 3745).

### 2. Consulting Psychologist – Dr. Herschel Pickholtz – July 2015

Psychologist Herschel Pickholtz examined Manchook on July 28, 2015. (Tr. 1535-1543). Manchook was homeless at the time and living at a shelter. (Tr. 1536). She reported that anxiety prevented her from working. She reported that she was taking medication for her mental health symptoms and was satisfied with her medication regimen. The only reported side effect from her medication was that it made her tired. (Tr. 1536).

Dr. Pickholtz opined that Manchook's persistence and pace were average. (Tr. 1537). She was dressed neatly and appropriately. Her motoric activity was a little bit anxious. She was compliant and had no difficulties understanding or responding to questions and directions. Her eye contact was appropriate and consistent. Her tone of voice was a little sad, but her speech was otherwise normal. Her verbalizations were logical, coherent, relevant, and goal directed. (Tr. 1539). Her overall affect was a little constricted and her mood was a little anxious, but not depressed. Her facial expressions were full and she smiled and laughed on several occasions.

She was courteous and mostly relaxed during the evaluation. (Tr. 1540). Dr. Pickholtz estimated that Manchook's IQ was in the average range. Her arithmetic, her recall of sequential numbers and her abstract thinking were also in the average range. (Tr. 1540).

Dr. Pickholtz opined that Manchook had no limitations in her ability to understand, remember, or carry out instructions and no significant impairment with concentration, persistence, or pace when performing simple tasks. (Tr. 1542-1543). He opined that she would be somewhat impaired in her ability to interact with others and respond to work pressure, but those limitations were not work preclusive if she remained sober and compliant with medication. (Tr. 1543).

### 3. State Agency Reviewing Physicians

In September 2015, Psychologist Stanley Kravitz, Ph.D., reviewed Manchook's record and opined that, due to her depression and anxiety, she would have difficulty responding appropriately to changes in the work setting though this would not preclude completing a 40-hour week. Dr. Kravitz opined that Manchook was able to adapt to minor and infrequent changes in the work setting and could perform routine 1-3 step work activities with support and explanation for major changes. (Tr. 587-588).

On reconsideration, Connie Jenkins, M.D., reviewed Manchook's updated records on December 16, 2015 and affirmed Dr. Kravitz's opinions. (Tr. 640-644).

### C. Relevant Testimonial Evidence

#### 1. Manchook's Testimony

Manchook was single and living in an apartment with her four-year-old daughter. (Tr. 530). She had a driver's license but did not own a car. (Tr. 530). She used "dial a ride" at least once a week. Manchook obtained her GED and took some college courses; she did not have a college degree. (Tr. 532). She attended nursing classes in high school and had earned an STNA certificate. She attended classes to become a limited practice nurse ("LPN") but did not complete the courses. (Tr. 533).

Manchook previously worked as an STNA, assembling parts at a factory, and at McDonald's as a fast food worker. (Tr. 538). Manchook could no longer work due to high anxiety. She did not have delusions or hallucinations, but she did have a history of suicide ideations. (Tr. 539). She was hospitalized once for suicide ideations and was admitted overnight another time at Lake West Hospital. (Tr. 540). She had a hard time with time constraints and encountering other people. (Tr. 545, 548). She could make appointments and keep them, but the anxiety from them would cause her to shut down for a couple of days and spend a lot of time sleeping. (Tr. 546).

Manchook had three children. She had a 16-year-old son who lived with his father; an 11-year-old daughter who stayed with friends of hers; and a four-year old daughter who lived with her. (Tr. 541). Her son had mental health issues and was violent. (Tr. 541). She no longer had any contact with him. (Tr. 542). Her 11-year-old daughter began living with Manchook's friends because Manchook was homeless. (Tr. 542). She would not be prevented from having her 11-year-old daughter live with her. In fact, she lived with her during the summer of the administrative hearing. (Tr. 542).

Manchook had several friends who helped her.  She had a good relationship with her mother.  She had a support system of therapists, doctors, counselors and her case worker.  (Tr. 543).  Manchook occasionally missed a doctor's appointment because she was unable to get up and get moving.  (Tr. 552).

Manchook previously underwent electroshock therapy.  (Tr. 546-548).  She discontinued it because she blacked out in her car.  (Tr. 546).  She was also having problems with concentration and remembering, which her doctors said might be caused by the electroshock therapy.  (Tr. 548).

Manchook did not think she could return to her work as an STNA due to her anxiety.  Also, she did not feel it would be safe for her to care for elderly people.  She did not think she could return to the McDonald's job due to the stressful nature of it and dealing with customers.  She did not know if she could return to the job assembling parts.  (Tr. 549-550).

Manchook was able to prepare meals and do laundry.  (Tr. 550-551).  Friends helped her clean her apartment at least once a week.  (Tr. 551, 562).  She walked with her daughter to the park a couple days a week.  (Tr. 553).  She also went to the lake and did a lot of "self-soothing."  She liked to draw.  (Tr. 554).

She stated she took medication for her mental impairments.  (Tr. 555).  She had a benign brain tumor that was being monitored.  Her father died from brain cancer.  (Tr. 556).  Manchook had shoulder pain related to her stress.  (Tr. 557).  She sometimes had insomnia and only got four hours of sleep.  (Tr. 558).  She took naps a couple of times a week.  (Tr. 559).

### 2. Testimony of Brett Salkin, Vocational Expert

Vocational Expert ("VE"), Brett Salkin, also testified.  Mr. Salkin considered Manchook's past work to be as an STNA, a parts assembler and a fast food worker.  (Tr. 565).

The only part of the VE's testimony that is relevant to Manchook's appeal is his testimony that an individual who was off task 20% of the time in an eight-hour work day or was absent more than two days a month would not be able to perform any job in the local or national economy. This opinion was based on his personal experience rather than the *Dictionary of Occupational Titles*. (Tr. 570).

## IV.     The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

5.  Manchook had the ability to perform light work except she could lift and carry 20 pounds occasionally and 10 pounds frequently; sit for 6 hours; push/pull as much as she could lift and carry; she could frequently climb ramps and stairs, occasionally climb ladders, ropes and scaffolds; frequent balance, stoop, kneel, crouch, and crawl; she needed to avoid concentrated exposure to dust, odors, fumes, and pulmonary irritants; she was limited to performing simple, routine, and repetitive tasks, but not fast paced or high production work; she was limited to simple work-related decisions; she could have occasional and superficial interaction with supervisors, coworkers and the public, meaning no arbitration, mediation, confrontation, negotiations, supervising others, or commercial driving; she was limited to tolerating few changes in a routine work setting defined as occasional. (Tr. 494).

10. Considering Manchook's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could perform. (Tr. 510).

Based on all his findings, the ALJ determined that Manchook was not disabled from February 15, 2015 through the date of his decision. (Tr. 511).

## V.     Law & Analysis

### A.     Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla

13

of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner may not be reversed just because the record contains substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986); see also *Her v. Comm'r of Soc. Sec.*, 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." See *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen,* 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

The court also must determine whether the ALJ decided the case using the correct legal standards. If not, reversal is required unless the legal error was harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not

14

build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue,* No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

In considering a Social Security benefits application, the Social Security Administration must follow a five step sequential analysis: at Step One, the Commissioner asks if the claimant is still performing substantial gainful activity; if not, at Step Two, the Commissioner determines if one or more of the claimant's impairments are "severe;" if they are, at Step Three, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; if not, at Step Four, the Commissioner determines whether the claimant can still perform his past relevant work; if not, at Step Five, if it is established that claimant can no longer perform her past relevant work, the burden shifts to the agency to produce evidence that a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Comm'r of Soc. Sec.,* 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920. A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. §404.1512(a).

### B. Treating Physician Rule[3]

Manchook contends that the ALJ erred by failing to properly evaluate one of the three opinions submitted by Dr. Wasserstein. In particular, Manchook argues that the ALJ failed to address Dr. Wasserstein's opinion that Manchook would be absent about four times per month. Manchook contends that this opinion was supported by the medical record because Manchook was attending weekly counseling and other appointments to treat her mental impairments. Manchook also cites the VE's testimony that work would not be available for an individual who missed more than two days per month. ECF Doc. 12 at 4.

The administrative regulations implementing the Social Security Act impose standards for weighing medical source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). In making disability determinations, an ALJ must evaluate the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013). The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Even if the ALJ does not give the opinion controlling weight, the treating source opinion is still entitled to significant deference or weight that takes into account the length and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)-(6). The ALJ is not required to explain how he considered each of these factors

---

[3] [3] 20 CFR §§ 416.927 applies to Manchook's claim because it was filed before March 27, 2017.

16

but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938. ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned.")

The ALJ's "good reasons" must be "supported by the evidence in the case record and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). As the Sixth Circuit has noted,

> [t]he conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to the treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id.* at 377.

A failure to follow these procedures "denotes a lack of substantial evidence, even [when] the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

Regarding Dr. Wasserstein's opinions, the ALJ stated:

17

> Dr. Wasserstein completed a medical source statement in November 2016, and opined had [sic] marked limitations in maintaining concentration and attention for extended periods, sustaining a routine without special supervision, responding to customary work pressures, responding appropriately to changes in the work setting, and behaving in an emotionally stable manner (45F/1-2). Dr. Wasserstein opined the claimant had moderate limitations in relating to other people, performing activities within a schedule, maintain regular attendance, being punctual, understanding, carrying out, and remembering instructions, using good judgment, and performing complex, repetitive, or varied tasks. She opined the claimant had only mild limitations in responding appropriately to supervisors and co-workers, performing simple tasks, and performing daily activities. Dr. Wasserstein also opined the claimant's condition would likely deteriorate if she was placed under stress, even that of simple, routine work, and she would be absent five times or more per month (45F/2).
>
> Dr. Wasserstein also completed a medical source statements [sic] in June 2017, and opined the claimant would be off task at least 20% of the time and absent about four times per month when either her bipolar disorder or anxiety is exacerbated (58F/3). She also opined the claimant had marked limitations in concentration, persisting or maintaining pace, and adapting or managing oneself (59F/3). She opined the claimant is moderately limited in interacting with others, and mildly limiting [sic] in understanding, remember, or applying information. Lastly, she opined the claimant had minimal capacity to adapt to changes in her environment or to demands that are not already part of her daily life (59F/3).
>
> I give partial weight to the opinions of Dr. Wasserstein. Although Dr. Wasserstein specializes in treating mental impairments and has a long-term treating relationship with the claimant, her opinions were not supported with relevant evidence. Dr. Wasserstein provided no explanation or narrative for these limitations. Outside of her opinion statements, these opinions are also not consistent with the record as a whole. Dr. Wasserstein's own treatment notes do not support marked limitations. As discussed above, her mental status examinations of the claimant generally showed she had depressed to anxious mood, but euthymic affect, and was otherwise alert and oriented, pleasant, made good eye contact, was casually groomed, and had normal psychomotor activity. Her attention and concentration was within normal limits. Her mood and affect were euthymic. Her speech was regular. Her thought process was goal oriented and her associations and thought content were within normal limits. Her recent and remote memory were grossly intact. Her judgment and insight were fair (46F/4-5). Her treatment notes also reflect the claimant's medications have been relatively stable and have controlled her symptoms fairly well. Lastly, Dr. Wasserstein and her prior doctor, Dr. Nosanchuk, consistently assigned her GAF scores of 60, indicating only moderate symptoms (43F/33;54F).

(Tr. 508-509).

The ALJ never mentioned Dr. Wasserstein's second June 2017 opinion questionnaire regarding absenteeism. (Tr. 3745). A failure to consider a medical source opinion is error. The Commissioner argues that the ALJ was not required to specifically evaluate the June 2017 absenteeism form because he evaluated the other two opinions from Dr. Wasserstein and provided good reasons for assigning only partial weight to these opinions. Indeed, for the most part, Manchook does not challenge the thoroughly explained decision of the ALJ, including his explanation related to Dr. Wasserstein's opinions.

However, Manchook has identified a distinct problem with the ALJ's analysis – he did not address Dr. Wasserstein's opinion that Manchook would be off task more than 20% of the day and would miss four days of work per month. The Commissioner is correct in stating that an ALJ is not required to provide an "exhaustive factor-by-factor" analysis of the opinion. *Biestak v. Comm'r of Soc. Sec.,* 880 F.3d 778, 785 (6th Cir. 2017), cert. granted on other grounds *Biestak v. Berryhill,* 138 S.Ct. 2677 (2018). But here, the medical record clearly supports Dr. Wasserstein's opinion that Manchook would miss four days of work per month. Throughout the relevant time period, Manchook was attending multiple counseling and medical appointments. The ALJ makes frequent references to this in his decision (Tr. 492, 493, 494, 500, 506). He actually cites these frequent appointments as support for his conclusion that she had a "greater ability to handle interactions with others and maintain a schedule and adapt to changes than she has alleged." But arguably these appointments helped her maintain that level of functioning. There was no evidence that she would be able to maintain the same level of functioning without the frequent counseling appointments. In fact, Dr. Wasserstein opined that Manchook was likely to deteriorate if placed under stress. (Tr. 3126).

And, the ALJ did not factor the work that Manchook would need to miss to attend these frequent appointments into his rejection of Dr. Wasserstein's opinions. The ALJ did not discuss this part of Dr. Wasserstein's opinion at all. The error was not harmless because the VE testified that an individual who was off task 20% of the time in an eight-hour work day or was absent more than two days a month would not be able to perform any job in the local or national economy. (Tr. 570). In this case, the ALJ needed to explain his rejection of this specific opinion. By failing to do so, he failed to build a logical bridge between the evidence and his decision. I recommend that the Court remand the ALJ's decision for further proceedings consistent with this report.

## VI.   Recommendations

Because the ALJ failed to adequately explain his consideration of Manchook's treating physician's opinion, I recommend that the final decision of the Commissioner be VACATED, and the matter be REMANDED for further proceedings consistent with this report.

Dated: May 9, 2019

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).